UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.10-11122-RWZ

GENNA GRETSKY

v.

EDELSTEIN & COMPANY LLP, *et al.*

FINDINGS OF FACTS AND CONCLUSIONS OF LAW

October 18, 2011

Zobel, D.J.

Plaintiff Genna Gretsky brings this action against his former employer, defendant

Edelstein & Company LLP ("Edelstein" or "the firm"), the firm's managing partner

William Mahoney, and another partner at the firm, Scott Kaplowitch, to recover benefits

allegedly due under the firm's 401(k) plan ("the Plan") (Count 1), and damages for

failure to provide Plan documents (Count 3) and for retaliatory discharge (Count 4).[1]

A three-day bench trial was held on September 26-28, 2011. Per the parties'

agreement, the issues tried with respect to Counts 1 and 4, respectively, were whether

the firm's decision to administer the employer match on a "payroll period basis" was

---

[1] Three of the original five claims remained for trial: (1) recovery of benefits due under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) (Count 1); (2) refusal to supply requested Plan information in violation of 29 U.S.C. § 1132(c) (Count 3); and (3) unlawful discharge in violation of 29 U.S.C. § 1140 (Count 4). I granted plaintiff's motion to voluntarily dismiss Counts 2 and 5, for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2), and common law violation of public policy, respectively. (Docket # 10 and Electronic Order Oct. 4, 2010.) I granted defendants' motion to dismiss Count 3 as against defendants Mahoney and Kaplowitch. (Docket # 13.)

arbitrary, and whether the firm discharged plaintiff for filing a complaint under ERISA. (Docket # 26.) As to Count 3, the questions were: (1) when plaintiff first requested the Plan documents; (2) whether he maintained his demand or withdrew it; and (3) whether he requested the Plan documents a second time. Id. Plaintiff has the burden of proof on each issue.

Following are my findings of fact and conclusions of law.

## I. Findings of Fact

Edelstein is an accounting and financial services firm in Boston. Gretsky is a certified public accountant who entered the employ of Edelstein on May 1, 2000. He worked for the firm for nine years before he was terminated on July 2, 2009. As he acknowledged in his trial testimony, he was an "at will" employee and worked at the pleasure of the partners. He held several titles at Edelstein including accounting associate and, eventually, Director of Information Systems. (Ex. # 7.) Before his termination, Gretsky was in charge of the firm's information technology (IT) department.

### A. Edelstein's 401(k) Plan

Among other fringe benefits, the firm offered a 401(k) plan[2] for any employee who completed three months of service and was over age 21 (a "Plan participant" or "participant"). (Ex. # 18 at 10; Ex. # 20 at 4-5.) A summary plan description was available to employees on the firm's intranet site (Ex. # 5 at 3), and the Plan was also described in the firm's personnel handbook. (Ex. # 1 at 30; Ex. # 2 at 39; Ex. # 3 at 41.)

---

[2] Edelstein's 401(k) plan was combined and administered in concert with the firm's profit-sharing plan. The benefits at issue relate only to the 401(k) plan.

Edelstein was the Plan's administrator and the Plan year ran from January 1 to December 31.  (Ex. # 17 at 2; Ex. # 19 at 2.)

Each year, a Plan participant could elect to defer a percentage of his compensation to the Plan ("elective deferral amount"), up to the legal annual maximum ("elective deferral limit").[3]  (Ex. # 18 at 11; Ex. # 20 at 10, 13-14.)  Edelstein had discretion under the Plan to match each participant's elective deferral amount at a rate selected by the firm on a uniform basis for all participants ("the employer match" or "employer contribution").  (Ex. # 17 at 6; Ex. # 18 at 11-12; Ex. # 19 at 8; Ex. # 20 at 14.)  The employer match was entirely discretionary; Edelstein was not obligated to offer the match and could change or withdraw it at any time the firm deemed necessary. Id.

During Plan years 2006 through 2008, the firm matched each participant's elective deferral amount at a rate of $0.25 for every $1.00 contributed by the participant, up to 6% of the participant's income.  (Ex. # 1 at 30; Ex. # 2 at 39; Ex. # 3 at 41.)  The Plan document for 2006 and 2007 provides that all elective deferrals "including the amount and frequency of deferrals, shall be subject to the rules of the Administrator which shall be consistently applied and which may be changed from time to time."  (Ex. # 18 at 11.)  At trial, Firm Administrator Carmela Martell testified that it was the firm's longstanding practice to administer the Plan on a "payroll period" basis.[4]

---

[3] The Internal Revenue Code imposes a limit on the maximum elective deferral that an employee can make each year to a qualified 401(k) plan.  See 26 U.S.C. § 402(g).  For participants like Gretsky who were under age 50, the applicable elective deferral limit for the Plan was $15,000 in 2006, and $15,500 in 2007 and 2008.

[4] At trial, Martell explained that the firm paid its employees weekly, resulting in 52 to 53 payroll periods per year.

Although the 2006 and 2007 Plan document does not specify that the Plan will be administered "per payroll," a Plan document from 2002 indicates that the employer matching contribution will be determined at "all payroll periods ending within each month." (Ex. # 16 at 13.)

Each week the firm withheld a participant's chosen elective deferral amount from the participant's wages, and calculated and deposited the employer match at the stated rate, to a maximum of 6% of the participant's income for that payroll period.[5] Once a participant had contributed the elective deferral limit for the year, no additional amount would be withheld from the participant's weekly compensation until the following Plan year began. However, since the employer match was also administered at each payroll period, a participant who reached the elective deferral limit before the end of the Plan year would not receive an employer match for the remaining payroll periods in that Plan year. As discussed below, the 2006-2007 Plan document did not allow for a year-end "true up," or administration of an additional employer match based on a participant's annual gross income.

### B. Gretsky's Plan Benefits, 2006-2008

In 2006, 2007, and the first few months of 2008, Gretsky elected to defer 50% of his compensation to the Plan (Ex. # 43), and therefore reached the elective deferral limit well before the end of the Plan year.[6] Pursuant to the firm's policy of administering

---

[5] Suppose, for example, that a participant made $2,000 per week. Only the first 6% of the participant's <u>weekly</u> salary, or $120, would be eligible for the employer match. Since the firm matched eligible income at a rate of $0.25 per dollar, at each payroll period the participant would receive $30 (i.e., .25 x 120) in employer matching contributions if the participant's elective deferral was at least 6%.

[6] For example, in 2008 Gretsky would have reached the elective deferral limit in about 15 weeks had he continued to defer 50% of his income. (Ex. # 5 at 1.)

the Plan on a payroll period basis, 6% of Gretsky's weekly income was matched only

during those weeks in which he was contributing to the Plan even though his

contributions had not yet reached the elective deferral limit.   Thus, while electing to

defer a high percentage of his compensation allowed Gretsky to quickly reach the

elective deferral limit each year, his choice had the unfortunate effect of depriving him

of the maximum amount of matching contribution that the firm offered.

Around February or March 2008, Gretsky spoke to Mahoney about the

discrepancy between the employer match he received in 2006 and 2007 and the

amount he believed he was entitled to under the Plan.[7]  (Ex. # 27 at 4.) Mahoney

referred Gretsky to Carmela Martell.  In addition to asking Martell about how to take

advantage of the full employer match, he also requested to see the full Plan document.[8]

(Ex. # 5 at 2-3.)

Martell responded the same day.  She informed Gretsky about the firm's method

of administering the employer match at each payroll period.  Id. at 1. She further

explained how he could maximize the employer match for 2008 by filling out a form to

change his elective deferral percentage to 6%.  Id.  Later that day, he completed the

form—changing his elective percentage to 6%—and returned it to Martell.  (Ex. # 8.)

---

[7] Gretsky claims that the firm owes him $2068.15 in unpaid employer matching contributions:
$1000.81 for 2006 and $1067.34 for 2007.  (Docket # 1 ¶ 21.)

[8] Specifically, Gretsky wrote: "I read the plan summary posted on the intranet but found no
formula for the calculation of the 401K match.  So, I'm at a loss as to what I need to change my
percentages to in order to get the full match.  If you could give me the number, I would really appreciate
it.   Also, is the full plan document available for the perusal?  I would like to see the provision that Bill
Mahoney was referring to, so I don't make the same mistake again." (Ex. # 5 at 3.)

In that email dated March 27, 2008, Martell also informed Gretsky that the firm was "looking into the possibility of making changes to enable everyone to get the maximum match allowed based on total dollar amount deferred (independent of the weekly percentage). Stay tuned." (Ex. # 5 at 1.) In February 2008, Martell had inquired of the firm's third-party administrator, Angell Pension Group, about the possibility of administering a "true up" of the employer match on an annual basis. (Ex. # 44.) Angell Pension informed Edelstein that the Plan document provided that the employer match is calculated "per payroll" and that the Plan would need to be amended to allow for a "true up at year end." (Ex. # 44.) In February 2009, the firm amended the Plan accordingly for the 2008 Plan year. (Ex. # 9.) However, as Mahoney testified, Angell Pension advised the firm that it was not possible to retroactively amend the Plan for 2006 and 2007.

Gretsky testified that, after his correspondence with Martell in March 2008, he did not raise the issue of the employer match again until May 2009.[9] In a May 22, 2009 email to Mahoney, he complained that he did not receive the full employer match for 2008, and re-raised the issue for 2006 and 2007. (Ex. # 27 at 7.) The dispute over his

---

[9] In his Complaint, Gretsky alleges that he had a conversation with Mahoney about the Plan two weeks after his email correspondence with Martell, but admits that, after that conversation with Mahoney, he "decided to drop the matter for the time being." (Docket # 1 ¶ 27.)

2008 benefits was resolved by June 2009.[10]  (Ex. # 27 at 3.)  However, he continued to

complain about deficiencies for 2006 and 2007.  Id.

On May 27, 2009, Gretsky lodged a complaint with the Employee Benefits

Security Administration ("EBSA") about the amount of the 2006-2007 employer

matching contributions.  (Ex. # 40.)  In a June 5, 2009 email to Mahoney, Gretsky

informed Mahoney that he had filed a complaint with EBSA.  (Ex. # 27 at 5-6.)

Mahoney responded that "[w]e can't change [the employer matching contributions for]

2006 and 2007," and told Gretsky: "If you think you have been treated unfairly, you

should contact ERISA." (Ex. # 27 at 4-5.)

**C. Plan Documents**

Gretsky first requested Plan documents from Martell in his March 27, 2008

email.  See Note 8, supra.  He did not request to see them again until a June 5, 2009

email to Mahoney.  (Ex. # 27 at 2, 6.)  On July 2, 2009, he received a copy of the Plan

and summary plan description for the years 2006 and 2007, and a copy of the adoption

agreement and summary plan description for the 2008 Plan.  (Ex. # 14.)  Additional

documents—including the Angell Pension Group, Inc. Defined Contribution Prototype

Plan and Trust (Ex. # 21)—were mailed to Gretsky on September 30, 2010, as part of

Edelstein's pretrial document production.  (Ex. # 26.)  He testified that he did not

---

[10] Gretsky's complaint with the 2008 benefits stemmed from his understandable confusion in reviewing his Plan statements, where the final matching contribution for the 2008 Plan year was deposited and reflected in a Plan statement for early 2009.   After some correspondence with Mahoney, in an email on June 11, 2009, Gretsky wrote to Mahoney: "Although I still dispute the 2006 and 2007 amounts, I think we can consider the 2008 matching contribution question closed.  I am satisfied with it. Thank you!" (Ex. # 27 at 3.)

consider his request for plan documents to be fulfilled until October 1, 2010, when he received the firm's document production.

**D. Gretsky's Termination**

The parties agree that the first eight years of Gretsky's tenure at Edelstein were relatively uneventful. However, the partnership's business was increasing, it hired additional personnel, including Kimberly Brosnan, Human Resources Director, and the lines of responsibility became more stratified. That change began to impact plaintiff in December 2008. Among other things, the firm became concerned with what it perceived as his poor management of and supervisory skills over IT staff. Edelstein engaged an outside IT consultant, Keith Wolters, and required Gretsky to meet with Brosnan to discuss ways to improve. (Ex. ## 36, 48.) Both Brosnan and Mahoney testified that the meetings were not productive and, as a result, Brosnan recommended to Mahoney that Gretsky be fired in December 2008.

As Gretsky acknowledged at trial, disagreements also arose between him and Wolters over Wolters' approach to improving the firm's IT department. Brosnan testified that in April 2009, she, Mahoney, Kaplowitch, and Wolters met to discuss Gretsky's failure to update one of the firm's software programs in a timely fashion, and what the firm perceived as his disrespectful behavior toward Mahoney at a meeting of the firm's IT Committee. In April 2009, both Brosnan and Wolters recommended to Mahoney that Gretsky be fired. (Ex. ## 45-46.) Despite their recommendations, Mahoney testified that he declined to terminate Gretsky in December 2008 or April

8

2009 because he appreciated Gretsky's years of service with the firm and wanted to give him a chance to improve.

The issue came to a head on July 1, 2009, at Gretsky's annual review, at which Mahoney, Brosnan, and, for the latter part, Kaplowitch were present. Gretsky became upset when Mahoney informed him that he needed to improve his interpersonal skills. (Ex. # 12.) Among other things, he raised his voice, called Mahoney prejudiced, and made comments which Brosnan, Mahoney, and Kaplowitch perceived as threats to the firm's data security. Although Gretsky testified that his ERISA complaint was discussed at the review, Mahoney and Brosnan both deny that there was any substantive discussion of the ERISA issue. After Gretsky left the review, Mahoney, Kaplowitch, Brosnan, and some of the firm's other partners met and reached a decision to terminate Gretsky. The ERISA complaint was not discussed at this meeting. Gretsky was terminated the following morning.

## II. Conclusions of Law

### A. Recovery of Benefits Due

Edelstein's 401(k) plan is an employee benefit plan governed by ERISA. 29 U.S.C. § 1002(3). Under ERISA, a "participant or beneficiary" of an employee benefit plan may sue "to recover benefits due to him under the terms of his plan. . . ." 28 U.S.C. § 1132(a)(1)(B). Where a plan grants discretionary authority to the plan administrator, the court will review the administrator's decisions to determine whether they are arbitrary and capricious. Sullivan v. Raytheon Co., 262 F.3d 41, 50 (1st Cir. 2001). Since the Plan gave Edelstein complete discretion to determine whether and in

9

what amount to provide an employer match, the court will apply this standard to evaluate Edelstein's decision not to award Gretsky an additional employer match for 2006-2007.  The administrator's decision will be upheld if it was within the administrator's authority, reasoned, and supported by substantial evidence in the record.  Id. (quoting Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)) (internal quotation marks omitted).

It was within Edelstein's authority to administer the elective deferral and employer match on a payroll period basis.  The Plan document for 2006-2007 provided that elective deferrals were subject to the rules of the administrator (Ex. # 18 at 11) and earlier Plan documents explicitly provide for administration at each payroll period. (Ex. # 16 at 13.)

All participants were advised that the employer match was completely discretionary and could be changed at any time deemed necessary by Edelstein.  See, e.g., Ex. # 2 at 39. Since Gretsky was not assured of receiving an employer match at all, he was not denied a "benefit[ ] due" to him under the Plan, especially where the benefit was administered in a uniform fashion for all participants.  There is no evidence that Edelstein singled out Gretsky; to the contrary, Carmela Martell testified that Gretsky was not the only employee who was unable to maximize the employer match because of the firm's decision to administer the Plan on a payroll period basis.  Finally, Edelstein reasonably relied on the advice of its third-party administrator, Angell Pension Group, that it was not possible to conduct a true up for the years 2006-2007, in informing Gretsky that the firm could not change his employer match for those years.

10

For these reasons, Edelstein's administrative decision was not arbitrary or capricious, and the firm did not improperly deny Gretsky benefits due to him under the Plan.

**B. Refusal to Supply Plan Information**

ERISA contains several disclosure provisions to ensure that an "individual participant knows exactly where he stands with respect to the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 118 (1989) (citing H.R. Rep. NO. 93-533, p. 11 (1973), U.S. Code Cong. & Admin. News 1978 p. 4649). One such provision, 29 U.S.C. § 1024(b)(4), requires the administrator to provide certain plan information to a plan participant upon written request.[11] If the administrator "fails or refuses to comply with a request for any information" which the administrator is required to furnish, the administrator "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal." 29 U.S.C. § 1132(c)(1).

The court may appropriately consider the motives of the administrator and the prejudice to the plaintiff (or lack thereof) in deciding whether to award penalties under this section. Sullivan v. Raytheon Co., 262 F.3d 41, 52 (2001). See also Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 588-89 (1st Cir. 1993) (decision

---

[11] Subsection 1024(b)(4) reads, in relevant part: "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." The comma after "summary," although present in the statutory text, is most likely a scrivener's error. Subsection (b) refers throughout to the "summary plan description," sans comma, which is the most natural and intended reading of the statute.

11

not to impose penalties justified where there was no evidence that the administrator

acted intentionally or in bad faith in failing to timely provide requested plan documents,

and plaintiff suffered no prejudice by the delay); Kansy v. Coca-Cola Bottling Co. of

New England, 492 F.3d 54, 61 (1st Cir. 2007) (denial of sanctions justified where

plaintiff admitted that he suffered no prejudice from defendant's delay in producing

certain documents).

### 1. Gretsky's First Request for Plan Information

Gretsky requested the full 2007 Plan document on March 27, 2008.  Even

though he made his request with the goal of sorting out the employer matching issue,

his request for the full Plan document is unambiguous:  "[I]s the full plan document

available for perusal?"  (Ex. # 5 at 3.) While Carmela Martell explained how the firm

administered the elective deferral and employer match, she admitted that the summary

plan description "[was not] specific about the matching amount," (Ex. # 5 at 1) and she

did not give him a copy of the Plan document as he requested.

However, sanctions are not warranted because Edelstein did not act in bad faith.

Martell answered Gretsky's inquiry about how to maximize the employer match and,

that same day, Gretsky changed his elective deferral percentage based on her advice.

(Ex. # 8.)  The firm understandably thought that the issue had been resolved, a position

supported by Gretsky's admission both in his Complaint (Docket # 1 ¶¶ 27-28) and at

trial that he did not pursue the issue again until 14 months later.  Cf. Winchester v.

Pension Comm. of Michael Reese Health Plan, Inc., 942 F.2d 1190, 1194 (7th Cir.

1991) (defendant's laches defense was warranted where defendant  reasonably

assumed matter was closed and that plaintiff had received information necessary to determine "exactly where she stood with the plan," given plaintiff's two year delay in renewing her request for plan information).  The 14-month lag also suggests that Gretsky was not prejudiced by Edelstein's failure to furnish the Plan documents within 30 days of his March 27, 2008 request.

### 2. Gretsky's Second Request for Plan Information

Gretsky renewed his request for Plan documents on June 5, 2009, but on June 11, 2009, he acknowledged that his 2008 benefits were no longer in dispute (Ex. # 27 at 3) and clarified that his request was for the "rules in effect in 2006 and 2007[.]"  (Ex. # 27 at 2.) On July 2, 28 days after his renewed request, the firm sent summary plan descriptions and Plan documents for the years 2006-2008.[12]  While Gretsky does not dispute that Edelstein sent him these documents within the 30-day statutory period, he argues that the Angell Pension Group, Inc. Defined Contribution Prototype Plan and Trust (Ex. # 21) was necessary to understand how the employee match was calculated. It was thus an "instrument[ ] under which the plan [was] established or operated," 29 U.S. C. § 1024(b)(4), that Edelstein failed to furnish within 30 days of his request.

It is not necessary to determine whether the Prototype Plan and Trust was a document "under which the plan is established or operated," because Edelstein was not obligated to furnish this document to Gretsky.  The Prototype Plan and Trust is referenced in the 2008 Plan materials (Ex. # 20 at 13), and by this time, Gretsky had

---

[12] At trial, Gretsky testified that in mid-June 2009 Mahoney invited him into his office, promised to show him the Plan documents, and then refused to do so.   This incident, while curious, is irrelevant given that the firm responded to Gretsky's request within the 30-day period provided by statute.

narrowed his request to 2006-2007.  Furthermore, any failure by Edelstein to furnish this document did not prejudice Gretsky because it pertained to a Plan year for which the benefits are not in dispute.

**C. Unlawful Discharge and Retaliation**

ERISA prohibits the unlawful discharge of a participant "for exercising any right to which he is entitled under the provision of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C. § 1140.  The plaintiff bears the burden of proving that the employer terminated him with the specific intent of interfering with his ERISA benefits.  Kouvchinov v. Parmetric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008).  The "specific intent" requirement obligates a plaintiff to demonstrate that the employer's action was a "motivating factor" behind the termination.  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988)).  See also id. ("No ERISA cause of action will lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment."); McGann v. H & H Music Co., 946 F.2d 401, 408 (5th Cir. 1991)(under 29 U.S.C. § 1140, "the asserted discrimination is illegal only if it is motivated by a desire to retaliate against an employee or to deprive an employee of an existing right to which he may become entitled").

Where, as here, the plaintiff has no direct evidence of specific intent to discriminate, the burden-shifting framework of cases involving circumstantial proof of discrimination applies.  Kouvchinov, 537 F.3d at 67 (citing McDonnell Douglas Corp. v.

14

Green, 411 U.S. 792, 802-05 (1973)).  As a threshold matter, the plaintiff must make a

prima facie case of discrimination.  Id.[13]  To do that, "[he] must present sufficient

evidence from which the employer's specific intent to interfere with the plaintiff's

benefits can be inferred."  Barbour, 63 F.3d at 38.   He must show that: (1) he is entitled

to ERISA's protection; (2) he was qualified for the position; and, (3) he was discharged

under circumstances that give rise to an inference of discrimination.  Id.

As a participant in the Plan, plaintiff was unquestionably entitled to protection

under ERISA.  29 U.S.C. § 1002(7).  Whether he was qualified for the position held

remains in dispute, but is not necessary to resolve since he has offered no credible

evidence that he was discharged under circumstances giving rise to an inference of

discrimination.

Gretsky claims that the firm unlawfully fired him because he raised questions

about the employer match, requested Plan documents, and complained to EBSA.

(Docket # 1 ¶56.)  I credit the testimony of defendants and Brosnan that his complaint

was not discussed at the performance review on July 1, 2009, and that, in any event, it

played no part in the decision to terminate.  In addition, Edelstein produced unrefuted

evidence that Brosnan recommended terminating Gretsky as early as December 2008,

and both Brosnan and IT consultant Wolters again recommended termination in April

2009—well before the employer matching issue resurfaced on May 22, 2009, or plaintiff

---

[13] If the plaintiff does so, the burden shifts to the employer to articulate a legitimate,
nondiscriminatory reason for the adverse employment action.  Kouvchinov, 537 F.3d at 67.  If the
employer meets its burden, then the plaintiff must demonstrate that the reasons given by the employer
are a pretext for discrimination.  Id. The court need not reach these last two prongs because Gretsky fails
to make a prima facie case.

submitted his complaint to EBSA.

Nor is the scheduling of Gretsky's annual review (in July) suggestive of discriminatory motive. Gretsky had been reviewed at approximately the same time the previous year. (Ex. # 11.) Moreover, I accept the testimony of Mahoney that he and Brosnan entered Gretsky's annual review with no intention of firing him, but felt they were left with no choice after his reaction to the feedback he received. Finally, the amount in controversy—approximately $2,000—was relatively small and there is no evidence that the firm was unwilling to pay Gretsky that amount. To the contrary, the firm contacted Angell Pension Group to inquire about the possibility of administering a true up, but was told a retroactive true up for 2006 and 2007 was not possible.

I find that plaintiff has simply failed to prove that he was discharged for filing a complaint with EBSA.

## III. Conclusion

In accordance with the court's findings of fact and conclusions of law, judgment may be entered for all defendants as to Counts 1 and 4, and for Edelstein on Count 3. Further, the judgment shall reflect that the court previously allowed plaintiff's motion to voluntarily dismiss Counts 2 and 5 (Docket # 10), and defendants' motion to dismiss Count 3 as to Mahoney and Kaplowitch (Docket # 13).

|  October 18, 2011  |  /s/Rya W. Zobel  |
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |